700 S.W.2d 506 (1985)
G___ M___ H___, Respondent,
v.
J___ L___ H___, Appellant.
No. 13836.
Missouri Court of Appeals, Southern District, Division Three.
November 4, 1985.
*507 Cynthia L. Sudduth, Steelman, Hearne & Hearne, Salem, for appellant.
Terry Daley Schwartze, Rolla, for respondent.
CROW, Presiding Judge.
J___ L___ H___ ("J") appeals from a decree dissolving his marriage to G___ M___ H___ ("G"), insisting the trial court erred in adjudicating him the father of C___ A___ H___, a child conceived prior to, but born during, the parties' marriage.
G and J began dating "towards the end of April," 1981, a few weeks before G's high school graduation. J, as best we can determine from the record, was 20 or 21 years of age at the time, and was home in Missouri on leave from active duty with the United States Navy. G testifiedand J concededthat they first engaged in sexual intercourse with each other near the end of April, and that they had sexual relations with each other on several occasions thereafter until J departed to return to his ship at San Diego, California. That date, according to J and a friend who saw him the day he left, was May 15, 1981. Asked to describe his relationship with G at the time he returned to duty, J replied, "We was planning on getting married, and we was getting along pretty good."
G testified that she had menstrual periods on a regular 28-day cycle and that she had a menstrual period "[a]t the end of April." According to G, she had sexual intercourse with no one except J during April and May, 1981. She admitted, however, that she engaged in sexual intercourse with one R___ on June 27, 1981, describing the incident as "a one-night occurrence."
In mid-July, 1981, G, having had no menstrual period since the end of April, took a "pregnancy test," which confirmed that she was pregnant.
J, at that time, was "out to sea." G notified J of her condition by telegram. According to G, J replied by letter that he wanted her to have the child, and in subsequent letters he stated he wanted to marry her.
J, who understood from G that the child was due in December, planned to obtain leave so that he and G could marry before the birth.
On September 8, 1981, G visited Bernard L. Draper, a physician specializing in obstetrics and gynecology. His examination of G revealed "a three and a half month sized uterus."
J was granted leave by the Navy in December, and the parties were married December 26, 1981. Prior to his December leave, J had not seen G since the preceding May. J returned to Navy duty about January 5, 1982.
The child was born February 23, 1982. It was delivered by Dr. Draper, who noted that it "appeared to be full term," and that there was nothing which suggested "prematurity."
G took the child to California to visit J in May, 1982, remaining there about two weeks. G and the child then returned to the home of G's parents and remained there until J came to take G and the child to California to live in August, 1982. G, J, and the child resided in California a short time, after which G returned to Missouri with the child.
*508 After that, G and J never lived together. G filed a petition to dissolve the marriage on December 2, 1982. J, in his answer, denied that he was the father of the child and asserted that he had no duty to support it.
In an apparent effort to resolve the paternity issue, G and J agreed that samples of their blood and the child's would be submitted to The Minneapolis War Memorial Blood Bank in Minneapolis, Minnesota ("the Blood Bank"), for analysis and testing. Pursuant to that agreement, J, on January 27, 1983, went to a hospital in Missouri, where a sample of his blood was drawn by a medical technologist. On February 1, 1983, G and the child went to the same hospital, where samples of their blood were likewise drawn. H. Neil Grannemann, a medical doctor specializing in anatomic and clinical pathology who practiced at the hospital, was present when G and the child arrived to give their samples. Grannemann did not draw the samples himself, but he later checked the samples of all three individuals (J, G, and the child), packaged them, and took the container to the post office for mailing to the Blood Bank.
Under date of March 19, 1983, a letter was sent to J's attorney from the Blood Bank. The letter, over the signature of H.F. Polesky, M.D., director of the Blood Bank, stated:
"The attached protocol contains the results obtained in our laboratory on blood specimens from the individuals listed. We tested these samples for genetic factors. These factors can establish whether the tested man is not the biologic father of the child in question or whether he might be the father. Shown are the most probable phenotypes (observed genetic characteristics) for the child, mother, and alleged father, and the gene system index calculated for each genetic system tested. This index is a ratio comparing the tested man's chance of contributing the paternal gene to the child with the frequency of this gene in random men in the White population.
From the testing shown on the attached protocol it can be established that the alleged father is NOT one of the biological parents of the child in question. This conclusion is based on the fact that the results of testing in the Rh, Gci, Bf, and AcP genetic systems do not follow the expected rules of inheritance. Thus the protocol shows a zero (0) for the probability that the alleged father contributed to the genetic pool of the child, [C___ A___ H___].
In this case, in the Rh system, the child has inherited r, which is absent in both the presumed mother and the alleged father. Since this genetic marker (r) must have been inherited from one of the parents, failure to find it in either is proof of non-paternity for the alleged father, [J___ L___ H___].
The findings in the Gci, Bf, and AcP systems further corroborate the exclusion of [J___ L___ H___] as the father of the child, [C___ A___ H___]."
The "protocol" attached to the letter listed the following data:

 Alleged Gene System
"Gene System Child Mother Father Index
-------------------------------------------------------------
 ABO A A A 1.31796
 Rh R1r R1 R1 0
 MNSs MSs MSs MNSs. .899281
 Kell k k k 1.04384
 Fy a ab ab 1.16904
 Jk ab b ab .963391
 Gci 2 1s2 1s 0
 Bf FS S S 0
 Hp 12 12 2 1
 AcP AB AC A 0
 ESDi 12 12 1 1.01937
 GLO 12 12 12 1
 PGMi 1+1- 1+ 1-2+ 3.57143

Gene Frequency Set C
Paternity Index is 0
Likelihood of Paternity is 0%"
The letter and the protocol are hereafter referred to collectively as "the Polesky report."
After the Polesky report was received, counsel for the parties interviewed Dr. Grannemann about the tests and the results. In order to preserve Dr. Grannemann's comments and at the same time curtail expenses, it was agreed that the *509 interview would be recorded on audio tape, and that the tape would be received as evidence at trial. Counsel for the parties also interviewed Dr. Draper prior to trial, and the same method was utilized to create a record of that interview.
At trial, at which both parties appeared in person and with counsel and the child appeared by a guardian ad litem, the tape recordings of the interviews of Doctors Grannemann and Draper were offered in evidence by G's attorney and received without objection. Additionally, it was agreed that the Polesky report would be marked "Respondent's Exhibit A" and would be received in evidence to accompany the tape of the Grannemann interview. Accordingly, the trial court stated: "I'll note at this time that I have been handed Respondent's Exhibit A, which is documents which go along with Petitioner's Exhibit No. 3, a taped statement from a Dr. Grannemann, and hearing no objection, I am going to admit into evidence Respondent's Exhibit A." Immediately thereafter, the transcript shows: "(AT THIS TIME RESPONDENT'S EXHIBIT A WAS RECEIVED IN EVIDENCE AND WAS MADE A PART OF THIS RECORD.)"
Inexplicably, the trial court, some 11 weeks later in its findings of fact, conclusions of law and decree, stated: "The report upon which Dr. Grannemann based his opinion was never put into evidence...."
That finding, which is the subject of J's first assignment of error, is, of course, categorically refuted by the record. The effect of that mistaken finding by the trial court will be considered after we complete our summary of the evidence.
Dr. Draper, the obstetrician, was asked to assume that the only two dates on which the child could have been conceived were May 16, 1981, or June 27, 1981. Why the May 16 date was chosenit was the day after J departed to return to Navy dutyis unexplained. Nonetheless, Dr. Draper was asked for his opinion as to which of the two dates was the most likely for conception to have occurred. He responded:
"Alright, the um, the two suggested dates of climate would give respective, I'm sorry, expected dates of conception, would give respectively dates of confinement or of delivery of February 9 and of March 20 and she delivered approximately two weeks after the one and approximately one month before the next. Usually, we would expect to be able to determine that an infant was four weeks early, earlier than expected. Uh, the two weeks beyond the expected date falls within the normal range of expectation so, um, of the two dates, throughout the pregnancy the, um, earlier one seems more, more acceptable. Um, fitting it with size at various stages of pregnancy.
Um, there are really some confusing factors here. For instance, if conception occurred May 16, she was seen on for her first visit on September 8 and, um, that being the case the uterus should have been four months or approximately sixteen week size, it was in fact fourteen week size. Uh, that much variation is normal. Uh, another another factor that is interesting is, uh, the date of the pregnancy test supposedly done in July.... That certainly would have been expected to be positive relating to a May conception date. It would hardly be expected to be positive relating to a June 27 conception date. Um, the size at that first visit just fits neatly between the two dates, you can't really come to any conclusion on that basis. Um, let's see, heart tones were first heard from the stethoscope on December 7. That, one normally expects to begin to hear heart tones with a fetal stethoscope at 20 weeks gestation. If we use the May 16 conception date, uh, then she would have been six, twenty-four, twenty-five weeks but if we use the June 27 conception date she would have been a little less than that she would have been about twenty-three weeks. And with the previous visit in November they had not been audible with the fetus stethoscope. We got mixed, mixed confusion of information none of which is terribly reliable. In sum, I would have to say that it seems to *510 me that the date that we have fits better with the May 16th conception date."
Dr. Draper's interview also included this colloquy:
"Q. Now what you are basically saying at this point and time you cannot give us a 100, an opinion that's going to be 100% correct of the actual date of conception.
A. That's correct.
Q. But you are able to say that you believe in your medical opinion there is a greater probability of the date of May 16 rather than June 27.
A. That seems to fit better, yes.
. . . . .
Q. What is the normal gestational period as measured in days.
A. 40 weeks, 280 days.
. . . . .
Q. Uh, in looking at this data your examinations of [G], could you give a date as to when conception would normally be. Uh, that's a difficult question. What I am getting at is we have two dates of May 16 and June 27 that [G's attorney] has talked about. Based on your data?
A. If one calculates the date of conception backwards, assume that the date of delivery is full term 280 days then it would calculate backwards from February 23, the date of the last menstrual period would have been May 16, the date of ovulation and presumably conception would have been about May 29 or 30."
Dr. Grannemann, the pathologist, commenting on the Polesky report, explained that Dr. Polesky is an authority in the field of paternity testing and had authored one of the texts widely available on the subject. Dr. Grannemann added that he had attended courses conducted by Dr. Polesky. Dr. Grannemann professed familiarity with some of the testing procedures in determining paternity and stated that he had performed some of them.
One of the tests which, according to the Polesky report, excluded J as the father of the child was a test of the "Rh" genetic system. The findings with respect to the child were shown as "Rlr," with respect to G as "Rl," and with respect to J as "Rl." Dr. Grannemann explained that the finding "Rlr" regarding the child meant that the child "inherited a small r from somebody," and that inasmuch as neither G nor J had a "small r" in their genetic makeup, it was impossible for J to be the child's father.
The second test which, according to the Polesky report, excluded J as the father of the child was a test of the "Gci" genetic system. Regarding that test, Dr. Grannemann stated, "Now we are getting out of the blood group systems and we are getting into blood proteins." He added, "Now we are talking about the proteins that are in the plasma around the blood." The findings with respect to the child in this test were shown as "2," with respect to G as "ls2," and with respect to J as "ls." Dr. Grannemann explained that this meant the child has a "type 2 protein" which J does not have. This, according to Dr. Grannemann, excludes J as the father.
The third test which, according to the Polesky report, excluded J as the father of the child was a test of the "Bf" genetic system. Dr. Grannemann was unfamiliar with that test.
The fourth test which, according to the Polesky report, excluded J as the father of the child was a test of the "AcP" genetic system. The findings with respect to the child in this test were shown as "AB," with respect to G as "AC," and with respect to J as "A." Dr. Grannemann explained that "AcP" referred to "a red cell enzyme" called acid phosphatase. Dr. Grannemann noted that because the child was "type AB," G was "type AC," and J was "type A," the child had to have received the "B" genetic marker from its father, who had to be someone other than J.
Asked about the reliability of "these sorts of tests for excluding paternity," Dr. Grannemann replied, "I think they are quite reliable." He was then asked, "Would it be fair to say that if the zeros come up that we were just talking about *511 and that satisfies you at least with respect to this that excludes paternity as far as [J] is concerned?" Dr. Grannemann replied, "That's true."
In its conclusions of law, the trial court, citing Aversman v. Danner, 616 S.W.2d 117, 120[2] (Mo.App.1981), observed that a child born in wedlock is presumed to be legitimate irrespective of whether conception of the child may be calculated to have occurred before or after the marriage. The trial court also noted, on authority of J.M.L. v. C.L., 536 S.W.2d 944, 947[4] (Mo. App.1976), that the burden of proving illegitimacy is on the party asserting it.
The current state of the law applicable to paternity disputes is set out in In re L___, Part II, 499 S.W.2d 490, 492[1, 2] (Mo. banc 1973), a case where a married woman asserted that her alleged paramour, rather than her husband, was the father of a child conceived and born to her while she and her husband were married to each other and residing together:
"We are presented in this case with the ancient presumption that a child born in wedlock is presumed to be legitimate, which defendant is asserting for his own purposes rather than those of the child. At common law the presumption was conclusive and therefore a rule of substantive law. Today the presumption is rebuttable, an evidentiary presumption, and is overcome by a showing of substantial evidence (`clear, cogent and convincing proof') to the contrary. [Citation omitted.] Upon presentation by the party against whom the presumption operates of substantial evidence to rebut the presumption, the existence or non-existence of the fact once presumed is to be determined from the evidence as if no presumption had ever been operative in the case."
The trial court, endeavoring to apply the above principles, concluded that except for indirect inferences, J's "sole offering" to demonstrate illegitimacy was the opinion of Dr. Grannemann. Evidently, the trial court's reason for characterizing Dr. Grannemann's opinion as the "sole offering" by J on the issue of paternity was the trial court's finding, noted earlier, that the Polesky report, upon which Dr. Grannemann based his opinion, "was never put into evidence."
The trial court asserted it had found no precedent in the law which allows the Gci test (blood protein) or the AcP test (blood enzyme) to serve as a method of excluding J as the father. The trial court acknowledged, however, on the basis of Imms v. Clarke, 654 S.W.2d 281 (Mo.App.1983), that "blood groupings" (the first six tests listed in the Polesky report), if properly performed and the results properly analyzed, do provide a basis for determining the likelihood of paternity and are admissible in evidence.
At that point in its analysis, the trial court stated, "Since Dr. Grannemann's statement and opinion is based on non-paternity as shown by the Rh blood grouping (an accepted test) and the GCI and ACP test this Court now examines the methodology used in arriving at this conclusion."
The trial court then noted that although Dr. Grannemann assembled the labeled blood samples and mailed them to the Blood Bank, he (Grannemann) could not state which technician drew the samples from G and the child. The trial court further observed that the date the samples were mailed and the date they arrived at the Blood Bank were never established, that there was no testimony regarding the "time factors in testing," that no one testified how the "integrity of the blood samples" was preserved throughout mailing and testing, that no witness testified about the conditions under which the tests were performed nor about the methods employed to identify the characteristics, and that the professional qualifications of the unidentified person or persons who actually performed the tests were not established. Citing B.S.H. v. J.J.H., 613 S.W.2d 453, 457 (Mo.App.1981), the trial court concluded that it could disregard blood grouping test results where the blood test evidence was of dubious accuracy and origin and any conclusion which might be extracted from *512 it as to the issue of paternity depended significantly on speculation, conjecture, and nonprofessional extrapolation.
Having said this, the trial court held that J had failed to meet his required burden of proof to overcome the presumption of legitimacy. In its decree, the trial court, among other things, awarded custody of the child to G, granted J reasonable visitation rights, and ordered J to pay G $190 per month child support.
J's first assignment of error, as mentioned earlier, is that the trial court erred in finding that the Polesky report was never received in evidence. J maintains this finding was highly prejudicial to him in that the Polesky report conclusively proved that he was not the child's father.
We have already explained that the record clearly establishes that the Polesky report was received in evidence without objection, and that the trial court was indubitably wrong in saying otherwise in its findings. That being so, we must determine the impact of the error.
It is manifest, of course, that the Polesky report was hearsay and, upon proper and timely objection, its admission in evidence would have been improper. In saying this, we do not overlook the possibility that the test protocol, upon proper foundation, might have qualified for admission as a business record. § 490.680, RSMo 1978.
Be that as it may, the Polesky report was not objected to on any ground; indeed, it, like the tape recordings of the interviews of Doctors Draper and Grannemann, was received in evidence by agreement of the parties. Consequently, we must consider what the Polesky report was worth as evidence.
Hearsay evidence, if not objected to, is admissible and may be considered, along with other evidence, in determining whether a submissible case has been made. Conlon v. Roeder, 418 S.W.2d 152, 158-59[5] (Mo.1967). The probative worth and value of such evidence is for the trier of the facts. Bourne v. Manley, 435 S.W.2d 420, 427-28[8] (Mo.App.1968); Turner v. Yellow Cab Company of Springfield, 361 S.W.2d 149, 154-55[1] (Mo.App.1962).
Accordingly, in the circumstances here, the Polesky report was competent evidence, its persuasiveness being a matter for the trial court to assess. In that regard, we take note that in State ex rel. D___ K___ B___ v. W ___ G___ I___, 654 S.W.2d 218 (Mo.App.1983), Dr. Polesky appeared as a witness at the trial (a paternity dispute). Commenting on his testimony, the opinion states:
"The Blood Bank's director for the past seventeen years, Dr. Herbert Polesky, testified at trial as an expert on the Bank's testing program and procedures as well as on the results of the specific tests used to analyze the parties' blood samples. Dr. Polesky's qualifications as an expert are not questioned, so it is enough to say he is a physician with specialties in clinical pathology and blood testing, who has published and testified extensively on paternity testing." Id. at 219.
Obviously, the above case recognizes Dr. Polesky as an expert on blood analysis and its use in identifying genetic characteristics of individuals involved in paternity disputes.
If we rightly comprehend the trial court's treatment of the Polesky report in the instant case, the trial court (apparently guided by the erroneous belief that the report had not been received in evidence) did not look upon the report as evidence on the issue of paternity; that is, the trial court paid no mind to Dr. Polesky's findings on that issue. We reach this conclusion by reason of the trial court's statement that J's "sole offering" to demonstrate illegitimacy was the opinion of Dr. Grannemann. The trial court, it appears to us, considered the Polesky report only as a source which Dr. Grannemann utilized in reaching his opinion on the paternity issue. Even for that purpose, it is clear that the trial court discounted the value of the Polesky report because of skepticism about the integrity of the specimens, the quality of the testing processes, and the expertise of *513 those involved therein. Those considerations, of course, were proper items of concern for the trial court as the finder of the facts, and we do not fault the trial court for taking them into account. We do, however, hold that the trial court erred in finding that Dr. Grannemann's opinion was the sole medical evidence that J was not the child's father. The Polesky report, having been received in evidence without objection, constituted substantive scientific evidence on that issue, and the trial court should have considered it as such, giving it whatever weight, if any, the trial court felt it deserved.
J's first point is, accordingly, meritorious insofar as it spotlights the error just discussed. Whether J is entitled to a reversal, however, does not hinge on his first point, but on his second, which asserts that the trial court's determination that he (J) is the sire of the child is clearly erroneous in that there was clear, cogent, and convincing evidence establishing the converse.
In adjudicating that point, we consider all the evidence on the paternity issue, including the Polesky report. The scope of our review in this court-tried case is established by Murphy v. Carron, 536 S.W.2d 30, 32[1] (Mo. banc 1976). The trial court's decree will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. We should exercise the power to set aside a decree on the ground that it is against the weight of the evidence with caution and with a firm belief that the decree is wrong. Id. at [2].
Mindful of those guidelines, we direct our attention to the scientific and jurisprudential acceptance of blood analysis to exclude paternity.
In State v. Summers, 489 S.W.2d 225 (Mo.App.1972), a misdemeanor prosecution for nonsupport of a child, the defendant, who disavowed paternity, complained on appeal that the trial court erred in denying his pretrial motion to require the child and its mother to undergo a blood test. The Court of Appeals agreed and reversed the conviction, stating:
"Our search of the law has caused us to conclude that we must take judicial recognition that although serological blood tests to determine type or group cannot indicate that a particular person is the father of a child, they can be used to establish that a particular person is not the father. These tests when properly performed and interpreted, are recognized to be accurate and the results are admissible to establish non-paternity." Id. at 229.
State ex rel. D___ K___ B___, 654 S.W.2d 218, was an action by the State, as assignee of child support owed the mother of a minor child, against the mother's ex-husband and also against the child's putative father. The State sought judgment establishing paternity, fixing a monthly child support obligation, and granting recovery of public funds previously expended for the child and mother. As noted supra, Dr. Polesky testified in that case as to results of scientific analyses of the parties' blood samples. He explained that a battery of routine, well-accepted tests were used to analyze 16 separate sets of genetic traits or "markers" common to the parties' red blood cell antigen system, red blood cell enzymes, and serum protein. The first objective was to see whether it was genetically impossible for either the ex-husband or the putative father, or both, to be the child's sire. The second objective was to obtain data for calculating the probability of paternity of one not thus excluded. Two of the traits analyzed showed the ex-husband's paternity was a genetic impossibility, and thus excluded him. The tests further showed it was 91.1 per cent certain that the putative father was the biological father. The trial court granted the ex-husband's motion for a directed verdict at the close of the State's evidence, and entered judgment against the putative father on a jury verdict against him on all counts. Rejecting the putative father's challenge to the admissibility of Dr. Polesky's testimony, the Court of Appeals held that blood tests disprove paternity when they show a *514 particular person's paternity to be a genetic impossibility. Id. at 220. The Court found no error in the receipt of the testimony showing a 91.1 per cent certainty that the putative father was the actual father. The opinion observed that blood tests may sometimes yield a probability of paternity so low or inconclusive as to be devoid of probative value, and therefore be inadmissible, and that whether such is the case is a matter for the trial court to decide. Id.
Armitage and Cross, Paternity Testing In A Judicial Setting, 39 J.Mo.Bar 477 (1983), explains that paternity testing is the analysis and comparison of genetic characteristics which may exist in both a man and child in such a manner as to give rise to the inference that the man is the biological father of the child. These genetic characteristics are well expressed in the blood types of the tested parties.
According to Armitage and Cross, blood types are determined in each individual as a product of genes carried on chromosomes. Each chromosome has places (loci) for a myriad of genes that determine our genetic makeup, from the color of our eyes or skin to the type of blood we possess. Each person possesses 23 pairs of chromosomes, one of each pair inherited in a random fashion from each parent. Thus, each parent contributes one-half of his or her genetic information to their offspring. Uniqueness of individuals is a product of the inheritance of one gene of a pair from each parent, the number of genes, and the interaction and expression of the genes. In essence, each child provides an objective genetic description of its parents. Id. at 478.
Armitage and Cross point out that blood types, tissue types (HLA antigens), red cell enzyme systems, and serum proteins are generally controlled characteristics. Laboratory tests exist for each of these that can be used to trace their inheritance pattern from each parent. Id.
Armitage and Cross explain that there are two aspects of paternity testing that are frequently confused: the probability of exclusion (or exclusionary power of the test) and the likelihood of paternity. These are two separate determinations. The "probability of exclusion" is a mathematical determination indicating the probability that a falsely accused man will be excluded by a particular test system. For example, if a test system has an exclusionary rate of 99 per cent, then only one out of 100 falsely accused men would not be excluded as the biological father by the testing. When an exclusion of the alleged father is not obtained by testing, the inquiry then turns to calculating the "likelihood of paternity." This is an expression of how much more likely the alleged father is to be the true father than is an unrelated random man of the same race that would also not be excluded by the same testing. Id. at 478-79.
Two types of exclusions may be obtained, say Armitage and Cross: a first order exclusion or a second order exclusion. In a first order exclusion, the child possesses a character which is not found in the mother or the putative father. This character must have come from the biological father. In a second order exclusion, the alleged father possesses characters which he must pass on to all his children, but which are absent from the tested child. Either type of exclusion proves that the putative father is not the biological father. It is not possible, however, to conclusively establish paternity by any known test or combination of tests available. Id.
The most commonly used tests are those involving the six red blood cell antigen systems (ABO, Rh, MNSs, Kell, Duffy and Kidd). Reisner and Bolk, A Layman's Guide to the Use of Blood Group Analysis in Paternity Testing, 20 J.Fam.L. 657, 659, (1981-82); Schnake, Blood Test Evidence in Disputed Paternity Cases: Unjustified Adherence to the Exclusionary Rule, 59 Wash.U.L.Q. 977, 984 (1981). Those six are the first six listed in the Polesky report in the instant case.[1] Those *515 six, in combination with testing of the HLA system (a system of blood group markers possessed by the white cells of the blood), Reisner and Bolk, 20 J.Fam.L. at 666; Schnake, 59 Wash.U.L.Q. at 986-87, are recommended for routine investigations. Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage, 10 Fam.L.Q. 247, 257 (1976).
In the instant case, nothing in the Polesky report indicates that any testing was done regarding the HLA system. It will be recalled, however, that according to Dr. Grannemann, three genetic systems ("Rh," "Gci," and "AcP") out of the 13 that were tested, did establish that J is not the child's father. In addition, a fourth system listed in the Polesky report ("Bf") likewise excluded J as the father. Dr. Grannemann, however, as noted earlier, was unfamiliar with the test of that system and therefore could not enlighten the trial court about it.
Summed up, the record before us demonstrates that tests of 13 genetic systems were performed on blood samples of J, G, and the child at a facility recognized as competent by the parties (and by State ex rel. D___ K___ B___, 654 S.W.2d at 219) to perform such tests. In the opinion of Dr. Polesky, a recognized expert, the results of the tests of four systems conclusively exclude J as the child's father. In the opinion of Dr. Grannemannestablished as an expert by his own education and experiencethe results of the tests of three of the systems satisfy him that J is not the child's father. In Dr. Grannemann's words, "Once you find a test that excludes this person as the father you have a 100% chance that he is not the father or virtually 100% chance that he is not the father."
As mentioned earlier, the trial court's stated reasons for disregarding the Polesky report were the lack of evidence ruling out the possibility of errors in the labeling and testing processes, the failure to show when the samples were sent from Missouri by Dr. Grannemann and received by the Blood Bank, and the absence of testimony about the time factors in testing, the conditions under which the tests were performed, the methods employed to identify the genetic characteristics, and the qualifications of those who performed the tests and reported the results.
As hereafter explained, we find that the trial court's disregard of the Polesky report on those grounds was based on conjecture, and is without evidentiary support in the record.
Dr. Grannemann explained that the packaging and forms for the samples of the blood of J, G, and the child were supplied by the Blood Bank, that hospital records showed that J and G indicated that the tubes containing their samples were labeled with their respective names in their presence, that two samples were taken of the blood of each adult and one of the child, that the samples were refrigerated until he (Grannemann) mailed them to the Blood Bank, that he personally checked all five tubes and made sure that the identifying codes and signatures were on each of the vials, and that he personally packaged the specimens and took the package to the post office for mailing. He added that if there had been any problem with the specimen labels upon receipt at the Blood Bank, he would have gotten a call for another sample. Asked whether anything in the records indicated to him that "something might not have been done correctly" in taking, labeling, preserving, and shipping the blood samples, Dr. Grannemann replied, "[T]here is nothing in these records that I have seen that I question as to whether it is valid and done properly."
Asked whether there was "a margin for possibly human error in identification on some of these [genetic] factors," Dr. Grannemann responded, "Yes, but in all honesty I would say that for one test, if you took one of these four that has a zero gene *516 system index that's true but in my mind when you couple four of them together the possibility of him being the father given proper labeling of the tubes and identification of the patients as zero." He added: "If the anti-coagulent [sic] doesn't work the specimen would not be suitable for use and we would have received a call for another specimen. Now, can you mix this up with other tests, uh, you could but in a laboratories that I am familiar with where we have done the tests you have on the bench the reagents and the specimen for one test and you don't have anybody elses blood there until you are through with running that test."
B.S.H., 613 S.W.2d 453, on which the trial court relied in disregarding the Polesky report, was factually unlike the instant case. In B.S.H., no medical witness testified regarding the taking of the parties' blood samples, nor was there any explanation of the tests performed or the results. Moreover, the blood grouping analysis evidence consisted only of exhibits (offered on a stipulation not adequately set out in the record) purporting to show the blood types of the man, woman, and two children involved. The only other exhibit was an extract from a treatise recognized in the medical profession as authoritative in matters of blood grouping examinations. Interpretation of the blood test results was not supplied by any expert witness, but was left for lay assessment. Id. at 456.
In the instant case, the method of taking the samples of blood of J, G, and the child was explained by Dr. Grannemann, the dates the samples were taken were established by hospital records which showed that J and G were present when the tubes containing their respective samples were labeled, Dr. Grannemann personally checked the vials and their labels and mailed the specimens to the Blood Bank, nothing in the hospital records supplied any reason for doubting the integrity of the samples shipped to the Blood Bank, and Dr. Grannemann received nothing from the Blood Bank indicating any irregularity or problem regarding the samples. Additionally, Dr. Polesky, in his letter, interpreted the results of the four tests which, in his opinion, established that J was not the father of the child. Dr. Grannemann explained three of those four tests and, like Dr. Polesky, concluded that those three excluded J as the father of the child. Thus, unlike B.S.H., interpretation of the test results was not left for lay assessment.
We hold that the trial court's reliance on B.S.H. as authority for disregarding the Polesky report as evidence on the issue of paternity in the instant case was misplaced.
The latest, and perhaps most thorough, of the Missouri cases dealing with blood analysis in paternity disputes is Imms, 654 S.W.2d 281. It holds, among other things, that the reliability of blood tests to exclude parentage in certain cases of blood groups is unquestioned in the scientific world and is admitted for that purpose in Missouri courts. Id. at 284. There, however, the pivotal issue was not whether the blood test results established that the putative father was not the actual father, but was instead whether blood test results showing an 89.1136 per cent probability that the putative father was the actual father were admissible.
In the instant case, we are dealing with blood test results establishing that J is not the child's father, not with blood test results indicating a certain per cent probability that he is the child's father. Consequently, Imms does not present the issue confronting us here.
The trial court in the instant case stated it had found no precedent recognizing blood tests of the Gci or AcP systems as a method of excluding paternity. The usefulness of such tests to supplement tests of the blood group systems is, however, recognized in the Joint AMA-ABA Guidelines, 10 Fam.L.Q. at 252-54, and in Reisner and Bolk, 20 J.Fam.L. at 669. See also: Schnake, 59 Wash.U.L.Q. at 993, n. 111. Additionally, the 16 genetic traits analyzed in State ex rel. D___ K___ B___, 654 S.W.2d at 219, included not only those of the red blood cell antigen system, but also *517 red blood cell enzymes and serum protein. As explained by Dr. Grannemann, "AcP" in the Polesky report refers to a red cell enzyme and "Gci" to a serum protein.
The instant case thus comes to us on a record in which undisputed scientific evidence, supplied by experts with no motive to be anything other than objective, establishes that it is genetically impossible for J to be the father of the child, and, in the face of that evidence, a finding by a conscientious trial court (endeavoring to heed the admonition that clear, cogent, and convincing proof is required to overcome the presumption of legitimacy of a child born in wedlock) that J failed to meet that burden and is consequently, in the eyes of the law, the child's father.
Summers, 489 S.W.2d at 228-29, citing Gradwohl, Legal Medicine, 576 (1954) states:
"Judicial disregard of blood test exclusions is no doubt due to a misconception of the true nature of the exclusion, which is a demonstrable and scientific fact of life. It is neither controversial nor in the field of expert testimony. The pathologist whose report excludes paternity is not giving `opinion' evidence. He is testifying to ... a fact of life and Nature."
We, as the trial court obviously did, feel compassion for the child and concern for G. That does not, however, justify disregarding what, on this record, is conclusive scientific proof that J is not the child's father. To affirm the judgment would be to ignore compelling scientific evidence which, simply put, cannot be sidestepped or discredited.
Accordingly, we hold that the trial court's finding that J is the child's father is unsupported by substantial evidence and is against the weight of the evidence, and that the decree, insofar as it declares J to be the child's father and requires him to pay child support, must be reversed. In doing so, we do not ignore the evidence that J, after the child was born, initially provided support for it and claimed it as a dependent on his 1982 tax return, nor do we disregard the fact that J's name appears on the child's birth certificate as its father or the trial court's observation that the child has "physical characteristics" similar to J, and is more similar to him than to G. That evidence, while undoubtedly relevant on the issue of paternity, cannot override the scientific evidence heretofore discussed.
Having concluded that the trial court's finding that J is the child's father cannot stand, we need not consider J's final assignment of error, which hypothesizes that the trial court's determination of paternity violates J's "constitutional right to life, liberty and property," under U.S. Const. amends. V and XIV and Mo. Const. art I. § 2 (1945).
That portion of the decree adjudicating J to be the father of the child, granting him reasonable visitation rights, ordering him to pay child support to G, and requiring him to sign a wage assignment is reversed. There being no other attacks on the decree, it is, in all other respects, affirmed.
PREWITT, C.J., and FLANIGAN and MAUS, JJ., concur.
NOTES
[1] Dr. Grannemann explained that "Fy" in the Polesky report refers to the Duffy system, and that "Jk" refers to the Kidd system. See: Reisner and Bolk, 20 J.Fam.L. at 664; Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage, 10 Fam. L.Q. 247, 271-72 (1976).