763 S.W.2d 212 (1988)
D.K.L., by K.L., her Next Friend, Appellant,
v.
H.P.M., Respondent.
No. 15596.
Missouri Court of Appeals, Southern District, Division One.
November 15, 1988.
Motion for Rehearing or Transfer Denied December 15, 1988.
Application to Transfer Denied February 14, 1989.
*214 James E. Reeves, Ward & Reeves, Caruthersville, and Charles Sampson Williams, Welman, Beaton, Williams & McVey, Kennett, for appellant.
Michael B. Hazel, Hazel and Ford, Caruthersville, and William M. Barvick, Jefferson City, for respondent.
Motion for Rehearing or Transfer to Supreme Court Denied December 15, 1988.
CROW, Presiding Judge.
On May 28, 1985, K.L. ("the mother"), an unmarried woman, gave birth to D.K.L. ("the child"). Some 18 months later the mother, as next friend of the child, instituted this action on the child's behalf against H.P.M. ("defendant"), seeking a judgment declaring defendant to be the child's father. Trial by jury produced a verdict in favor of defendant. Judgment was entered per the verdict. The child appeals.
We are presented with two assignments of error by the child's brief. The first maintains the trial court erred in allowing a witness for defendant, one J.W., an adult male, to testify, over the child's objection, that he (J.W.) and the mother engaged in sexual intercourse in September, 1984. The second avers the trial court erred in excluding the results of a "paternity blood test" performed at the instance of defendant. We summarize only the evidence necessary to decide the appeal.
The mother, age 29 at time of trial,[1] testified she met defendant, age 41 at time of trial, in August, 1981, and that they began "dating and going places together" about a month later. The relationship, according to the mother, lasted until Thanksgiving, 1984, and throughout it she and defendant engaged in sexual intercourse. The mother disclosed that during the relationship she "had trouble using the birth control pill" so defendant suggested she use a diaphragm and took her to a physician where she was fitted for one. The mother conceded she and defendant had "breakups" during the three years of their relationship, and that she did not have sexual intercourse with defendant from March, 1984, until September 2, 1984.
Defendant, in his testimony, admitted "a long history of sexual relationship" with the mother, and confirmed her testimony about the diaphragm.
Regarding the date of conception of the child, the mother testified that on Saturday night, September 1, 1984, she was working at a bar, that the bar closed at 1:30 a.m., Sunday, September 2, and that she departed *215 some 30 minutes later. She was uncertain whether she left alone or whether defendant picked her up, but she testified unequivocally that she went to defendant's home where she and he spent the remainder of the night alone together. The mother avowed that she and defendant had sexual intercourse at 4:00 a.m., explaining, "I looked at the clock." Asked whether she used "any form of birth control" on that occasion, the mother answered, "No, I did not."
Defendant, in his testimony, admitted the mother came to his home "on the early morning of September 2nd, 1984," but he insisted he did not bring her there. He conceded they had sexual intercourse "one time that morning" and that he did not "wear any type of contraceptive." In excerpts from his deposition, read to the jury, defendant admitted he is "a normal healthy male" and that he ejaculated in the mother's vagina during the liaison September 2, 1984.
A physician specializing in obstetrics and gynecology performed an ultrasound examination on the mother October 19, 1984, and determined that she had become pregnant September 2, 1984. Asked about the accuracy of the examination, the physician replied, "[P]lus or minus three to four days." The physician calculated an "expected delivery date" of May 27, 1985. The child, as noted earlier, was born one day later. The physician described the child as "a full-term, fully-developed child" weighing eight pounds, six ounces, characterized by the physician as "a normal weight for a full term child."
On February 11, 1987, some eight months before trial, samples of blood were drawn from the child, the mother and defendant at the blood bank at Baptist Memorial Hospital in Memphis, Tennessee. Laboratory tests of seven "blood group systems" resulted in the following determination:
"[Defendant] can not be excluded as the father of [the child]. The combined paternity index (genetic odds in favor of paternity) is 85. The relative chance of paternity, assuming a 50% prior chance, is 98.83%. Paternity is very likely."
At trial the child introduced the results of the blood test through the deposition testimony of the technical director of the blood bank. Explaining the meaning of the combined paternity index, the director testified, "This can be deemed as odds 85 to 1, the likelihood that [defendant] is the father."
During the opening statement of defendant's lawyer an exchange occurred that became the first incident in a chain of events upon which the child bases her first assignment of error. The exchange was:
"[Defendant's lawyer]: [The mother will] tell you that during, I believe, August or September of 1984, that the evidence will be that she, on several occasions, went to the home of a friend of [defendant's], a man by the name of [J.W.]. [J.W.] will tell you that in the month of September, 1984, that she came to his house in the early morning hours, two or three o'clock in the morning, after apparently working at the ... Bar, and came on two occasions after this September 2, 1984 date. The first occasion after that, they had sexual intercourse.
... The second time they did not have sexual intercourse.... And that was the last time that she went over there.
Now, ladies and gentlemen, don't get me wrong, we're not trying to say [J.W.] is the father of this child; we're not. He probably isn't.
THE COURT: Whoa. What will the evidence be ...? That's what your opening statement is, what your evidence will be.
[Defendant's lawyer]: The evidence Excuse me, Your Honor. The evidence will be that [J.W.] had a vasectomy back in the early '70s. The evidence will be that he's probably not the father.
[The child's lawyer]: Well, Judge, I move all of this be stricken from the record and counsel reprimanded for bringing up a collateral matter that could have absolutely no relevancy at all.

*216 [Defendant's lawyer]: It's very relevant, Your Honor, to the credibility of thistheir chief witness.
THE COURT: Well, this is an opening statement. You state what you expect the evidence to be. It is not necessary that this be stricken because I've instructed the jury that this is not evidence. Neither the opening statements nor the arguments. You may proceed."
The child presented the mother as a witness during the child's case in chief. In the mother's direct examination by the child's lawyer we find this:
"Q. ... During [defendant's lawyer's] opening statement he stated that [J.W.] had sexual intercourse with you. Is that true or false?
A. No. That is not true.
Q. Have you ever had sexual intercourse with [J.W.]?
A. No, I have not.
Q. What was [J.W.'s] relationship to [defendant]?
A. Best friend.
. . . .
Q. ... tell the ladies and gentlemen of the jury just what your relationship with [J.W.] was?
A. When [defendant] and I first started dating ... we would go out to the country club and [J.W.] being [defendant's] friend would sit and join us. And on several occasions he would come and sit and join us, talking, visiting. I felt like he was my friend as well as [defendant's] by ourwe dated over a three-year period. I talked to [J.W.] about [defendant] several occasions about ourevery time we would break up, thinking he might know something that would help in our relationship or help me deal with [defendant]. Basically, I thought he was my friend also."
During the mother's cross-examination by defendant's lawyer this colloquy occurred:
"Q. In the winter of 1983, did you have occasion to go to Blytheville with [J.W.]?
[The child's lawyer]: Judge, I object. Immaterial.
[Defendant's lawyer]: Pardon?
THE COURT: WhatWhat do you intend to show by that?
[Defendant's lawyer]: Well, I intend to show a prior relationship with [J.W.].
THE COURT: At or about the time of the conception of this child?
[Defendant's lawyer]: She has testified that there was no sexual relationship with him at or about that time, which is the time we're talking about. I'veIf the Court will permit me, I will offer some evidence to impeach her or at least I think is impeaching in regard to that.
[The child's lawyer]: Judge, furthermore, [defendant's lawyer] has stated that [J.W.] is sterile.
THE COURT: No.
[Defendant's lawyer]: I didn't state he was sterile, I said he had a vasectomy.
[The child's lawyer]: I say this is collateral, attempt to bring any collateral matters in and at the best, an attempt to impeach upon a collateral matter which is not permissible....
THE COURT: Sustained."
Defendant's lawyer, outside the hearing of the jury, offered to prove, by the mother's testimony, that she went to Blytheville with J.W. in the winter of 1983, that "a number of days or weeks" thereafter she went to J.W.'s house and engaged in sexual intercourse, and that she went to his house and engaged in sexual intercourse "approximately five different times," the last occasion being in September of 1984.
The child's lawyer objected on the ground of remoteness and on the ground that defendant was attempting to impeach the mother on a "collateral matter."
The trial court sustained the objection and denied the offer of proof.
Defendant, during his case in chief, called J.W. as a witness. During questioning by defendant's lawyer the following exchange occurred:
"Q. Mr. [W.], calling your attention to after September the 2nd, 1984, did [the mother] ever have occasion to be at your house?

*217 A. Yes.
Q. On how many occasions?
A. Two times.
Q. And during what month?
A. It was in September.
Q. And what year?
A. '84.
Q. And on either or both of these times did you and she engage in sexual intercourse?
[The child's lawyer]: Which we want to object to, Judge, on the ground it is an attempt to impeach upon a collateral matter, not an issue.
THE COURT: Overruled.
[Defendant's lawyer]: Did eitherOn either of these occasions, did you and [the mother] engage in sexual intercourse?
A. Yes.
Q. And was it on the first occasion after the September the 2nd or the second occasion after September the 2nd?
A. The first one.
. . . .
Q. Now, [J.], have you had a vasectomy?
A. Yes.
Q. When did you have it?
A. In '74.
Q. When was the last time you were ever checked to see if it was working?
A. It's two or three months after I had it.
THE COURT: And I take it ... that the purpose of these questions are to show that he isn't the father and therefore your questions are to attempt to affect the credibility of the mother; is that correct?
[Defendant's lawyer]: That is my main purpose, Your Honor. Of course, people with vasectomies sometimes father children. We don't allege that he is the father, but I would not want to mislead this jury and put him on and not mention that he had a vasectomy.
[The child's lawyer]: Well, I again move that
THE COURT: All right. The reason I'm asking that is because I am going to instruct the jury that this evidence shall be considered only insofar as it may affect the credibility of the mother...."
Neither party registered a protest about the trial court's proclamation that the jury should consider J.W.'s testimony only insofar as it may affect the mother's credibility.
The child's first point on appeal is:
"The trial court erred in overruling [the child's] objection to defendant's witness, [J.W.], testifying that in September, 1984, he and the mother had engaged in sexual intercourse because the testimony was impeachment of the mother on a collateral issue in that the defendant did not claim the witness was [the child's] father, the witness testified he had undergone a vasectomy in 1974 to affirmatively show he was not the father, and defendant offered the testimony for the sole purpose of affecting the credibility of the mother."
Defendant, in his brief, insists the trial court did not err in the respect charged by the child's first point, as J.W.'s testimony was "relevant and material." However, adds defendant, even if J.W.'s testimony was not relevant or material it was nonetheless admissible "under the doctrine of curative admissibility to rebut the [testimony] by [the] mother, during her direct examination, that she had not had intercourse with [J.W.] in September, 1984."
The child, in a reply brief, argues that the mother's testimony denying sexual intercourse with J.W. was given "in response to defendant's opening statement to the jury wherein he stated that the mother and [J.W.] had had sexual intercourse."
At the outset of our consideration of the child's first point we note that the Eighty-fourth General Assembly of Missouri, at its first regular session, enacted the "Uniform Parentage Act." Laws 1987, C.C.S.S.B. 328, pp. 646-53, effective July 15, 1987. It is codified as §§ 210.817-.852, RSMo Supp. 1987.
Were the Act applicable to the instant case, § 210.839 would bear on the child's first point. That section provides:

*218 ". . .
2. Testimony relating to sexual access to the mother at a time other than the probable period of conception of the child is inadmissible in evidence.
3. In an action against an alleged or presumed father, evidence offered by him with respect to a man who is not subject to the jurisdiction of the court concerning his sexual intercourse with the mother at or about the probable period of conception of the child is admissible in evidence only if he has undergone and made available to the court blood tests the results of which do not exclude the possibility of his paternity of the child. A man who is identified and is subject to the jurisdiction of the court shall be made a defendant in the action. Where such man is subject to the jurisdiction of the court, the alleged or presumed father shall provide all other parties with the name and address of the man at least thirty days prior to trial. If a male witness is produced at trial for the purpose stated in this subsection, but the party calling the witness failed to implead such male witness as a party-defendant or provide the notice required herein to all other parties, the court may adjourn the proceeding for the purpose of taking a blood test of the witness prior to receiving his testimony, if the court finds that the party calling the witness acted in good faith. If the court determines that the party calling the witness did not act in good faith as to the required notice, the court shall not grant a continuance, and such witness shall be incompetent to testify.
. . . ."
The Act, however, does not apply to the instant case by reason of § 210.852, which states:
"Unless agreed to by the parties and the court, the provisions of [the Act] shall not apply to proceedings to determine paternity commenced prior to July 15, 1987."
The instant proceeding was commenced December 10, 1986, some seven months prior to July 15, 1987, and nowhere in the record is there any hint that the parties and the trial court agreed that the Act would apply herein. Consequently, the issue of admissibility of J.W.'s testimony that he had sexual intercourse with the mother in September, 1984, must be determined without reference to the Act.
The child, insisting that such testimony was inadmissible, cites Hurlock v. Park Lane Medical Center, Inc., 709 S.W.2d 872, 877[2] (Mo.App.1985), and Overfield v. Sharp, 668 S.W.2d 220, 223[3] (Mo.App. 1984), for the proposition that as a general rule an opposing party is bound by a witness' answers elicited on cross-examination with respect to collateral matters inquired into for purposes of impeachment and is not permitted to introduce extrinsic evidence to refute the witness' answers.
While we do not dispute that proposition as an abstract statement of law, we find it inapplicable here. The proposition, by its own terms, pertains to answers elicited from a witness on cross-examination for the purpose of impeachment, and bars the cross-examining party from presenting independent evidence to contradict such answers when they relate to a collateral matter. The test as to whether a matter is collateral, as set forth in Frechin v. Thornton, 326 S.W.2d 122, 126 (Mo.1959), is whether the party seeking to introduce it for purposes of contradiction would be entitled to prove it as a part of his case.
In the instant case the mother's testimony that she had never engaged in sexual intercourse with J.W. was not adduced by defendant on cross-examination; instead, it was adduced by the child's lawyer on direct examination. Thereafter, on cross-examination, defendant attempted to ask the mother whether she had engaged in sexual intercourse with J.W. on certain occasions beginning in the winter of 1983 and culminating in September, 1984, the month in which the child was evidently conceived.
The rule applicable in such circumstances is found in Louis Steinbaum Real Estate Co. v. Maltz, 247 S.W.2d 652, 654-55 (Mo. 1952). There a witness for the plaintiffs *219 testified on direct examination that after the plaintiffs purchased the building that was the subject of the litigation he discovered that one floor had no tenant, that there was no valid existing lease pertaining to such floor, that the floor was still vacant at time of trial, that the company managing the building had done everything it could to get a tenant, and that no tenant could be found. On cross-examination the witness was asked whether, as a matter of fact, he never attempted to get a tenant from and after the date the sale was consummated. Objection, by the lawyer who had just examined the witness on direct examination, that the question did not call for evidence bearing upon the issues in the case was overruled and the witness was asked if he personally attempted to get a tenant for the vacant floor. He responded he had made no such effort for more than a year after the sale was consummated. On appeal from an adverse judgment the plaintiffs argued that the trial court erred in permitting the cross-examination. The Supreme Court of Missouri stated:
"The record ... demonstrates that this contention is not tenable. We need not further discuss it other than to say that certainly defendants' counsel had the right to cross-examine [the witness] as to the exact matters to which he testified on direct examination." Id. at 655[2].
The above principle was recognized in Missouri jurisprudence as early as Brown v. Burrus, 8 Mo. 26, 30 (1843), where the court said that if a witness is sworn and gives some evidence, however formal or unimportant, he may be cross-examined in relation to all matters involved in the issue.
It is manifest from Louis Steinbaum and Brown that inasmuch as the mother testified on direct examination that she had never had sexual intercourse with J.W., defendant was entitled to cross-examine the mother on that subject and the trial court ruled incorrectly in sustaining the child's objection to defendant's line of questioning on that issue. The pivotal question in the child's first point is consequently whether, after defendant's attempt to cross-examine the mother regarding sexual activity with J.W. had been thwarted by the trial court, defendant had the right to adduce testimony from J.W. that he had engaged in sexual intercourse with the mother in September, 1984.
Either party is entitled to introduce evidence to rebut that of his adversary, and for this purpose any competent evidence to explain, repel, counteract, or disprove the adversary's proof is admissible. Massman v. Muehlebach, 231 Mo. App. 72, 95 S.W.2d 808, 813 (1936); 98 C.J.S. Witnesses § 629 (1957). To "contradict" a witness and to "impeach" a witness are not synonymous, as impeachment is directed to the credibility of a witness for the purpose of discrediting him and ordinarily furnishes no factual evidence whereas contradiction is directed to the accuracy of a witness' testimony and supplies additional factual evidence. Talley v. Richart, 353 Mo. 912, 185 S.W.2d 23, 26[6] (1945).
Here, the mother, testifying as a witness for the child in the child's case in chief, denied, on direct examination by the child's lawyer, that she (the mother) had ever had sexual intercourse with J.W. Having raised this issue by her own evidence in her case in chief, the child opened the door to evidence contradicting the mother on that issue. Massman, 95 S.W. 2d at 813. J.W.'s testimony on that subject was, consequently, contravention of the mother's testimony, not merely an attack on her credibility.
While the child argues that by reason of J.W.'s alleged 1974 vasectomy, sexual intercourse between him and the mother in September, 1984, was not material to the issue of the child's paternity, but was instead a collateral matter, it is unnecessary to decide that question and we decline to do so.[2] In Frye v. Meramec Marina, Inc., 673 S.W.2d 451 (Mo.App.1984), the plaintiffs, during their case in chief, presented evidence on a collateral matter. The defendants, *220 during their case and over the plaintiffs' objection, presented evidence rebutting the plaintiffs' evidence as to the collateral matter. The appellate court held that once the evidence regarding the collateral matter had been presented by the plaintiffs, whether the trial court should permit the defendants to rebut it with like evidence rested in the sound discretion of the trial court. Id. at 454[4]. Thus, even if the mother's testimony in the instant case that she had never engaged in sexual intercourse with J.W. was collateral to the issue of the child's paternity, it was within the discretion of the trial court to allow defendant to rebut such testimony by presenting J.W.'s testimony that he had engaged in sexual intercourse with the mother in September, 1984. On the record before us, we cannot convict the trial court of an abuse of discretion in permitting such testimony.
The child insists, however, that the mother's testimony on direct examination that she had never had sexual intercourse with J.W. was presented in response to the opening statement of defendant's lawyer that the mother and J.W. had engaged in sexual intercourse in September, 1984. The child's theory, as we comprehend it, is that once defendant's lawyer mentioned the incident in his opening statement, the child should have been allowed to present the testimony of the mother that she had never had sexual intercourse with J.W., and that defendant should have been barred from (a) cross-examining the mother about it, and (b) contradicting the mother's testimony by the testimony of J.W.
The child cites no authority supporting such a hypothesis, and we are unaware of any. When the trial court refused the child's request to strike the reference to the mother's sexual encounter with J.W. in the opening statement of defendant's lawyer, the child could have chosen to ignore the matter when the child presented the mother's testimony, and to object had defendant (a) in cross-examining the mother, attempted to ask about the incident or (b) endeavored to present J.W.'s testimony on the subject during defendant's case in chief. Had the child's objections been overruled, the child could have preserved the point in the trial court and asserted it on appeal. The child, however, chose instead to present the mother's testimony that she had never engaged in sexual intercourse with J.W. Having so elected, the child cannot now convict the trial court of error in permitting J.W. to testify regarding his sexual encounter with the mother in September, 1984. The child's first point is denied.
The child's second point is:
"The trial court erred in excluding the results of the paternity blood test requested by the defendant ( ... Exhibit 2) because no further foundation was required for the report to be admitted into evidence in that the trial court ordered that [the child's] second request for admissions be deemed admitted by the defendant and consequently defendant admitted: (1) that blood samples were taken from [the child], her mother and the defendant; (2) the samples were tested by Roche Biomedical Laboratories; (3) that ... Exhibit 2 was the paternity blood test results as conducted by Roche Biomedical Laboratories."
Several months before trial defendant moved the trial court for an order compelling the child, the mother and himself to submit to a blood test by his expert. The motion was granted.
Some ten weeks later the child filed a "Second Request for Admissions" stating:
"... the [child], pursuant to Civil Rule 59, ... requests that the defendant admit the following:
1That defendant, ... after receiving a copy of the results of the paternity blood testing done at the Baptist Memorial Hospital, Memphis, Tennessee, requested a second paternity blood testing and selected the Roche Biomedical Laboratories at Burlington, North Carolina, to conduct the second paternity blood testing.
2That blood samples were taken from the defendant, [the child], and her mother, ... which were examined by Roche Biomedical Laboratories; that attached hereto is a copy of the paternity *221 blood testing results conducted by Roche Biomedical Laboratories which defendant... requested."
Attached to the above request was a one-page document with the printed heading: "Roche Biomedical Laboratories ... Burlington, NC 27216...." The document bore the names of the mother, the child and defendant, and set forth certain data regarding five categories of "red cell antigens" plus additional data regarding "leukocyte antigens" of the trio. The document also contained a narrative conclusion regarding the combined paternity index and probability of paternity concerning defendant and the child. At the foot of the document it stated: "The results have been reviewed independently by the undersigned and are correct as reported." It bore the signature "Lloyd C. Osborne," identified as a Ph.D. and Associate Director, Department of Paternity Evaluation. A notary's certificate reflected the document had been sworn to and subscribed May 11, 1987, at Burlington, North Carolina. We henceforth refer to the document as "Exhibit 2," its designation at trial.
Defendant filed written objections to the child's second request for admissions; the child responded by filing a motion that the second request for admissions be deemed admitted; defendant thereafter filed an amended reply to the child's second request for admissions. It is unnecessary to summarize the contents of those documents.
Two days before trial the trial court ordered that the child's second request for admissions "be deemed admitted."
During the child's case in chief the child's lawyer read to the jury the two numbered paragraphs of the child's second request for admissions and advised the jury that those paragraphs "have been admitted for the purpose of this lawsuit." The child's lawyer later offered Exhibit 2 in evidence. Defendant objected on the ground of "no foundation." The trial court sustained the objection.
We agree that the admissions requested in the second request for admissions, which the trial court ruled were deemed admitted by defendant, established that defendant selected Roche Biomedical Laboratories to conduct "paternity blood testing," that blood taken from the child, the mother and defendant was examined at Roche Biomedical Laboratories, and that Exhibit 2 was an authentic report of the results of the tests. The problem is that Exhibit 2 was, at best, an affidavit, made out of court, offered by the child at trial to establish the truth of the matters recited therein.
Absent agreement of the parties, an affidavit may not be considered as evidence at trial. Gilboe v. Doerflinger Realty Co., 614 S.W.2d 4, 6-7[3] (Mo.App.1981); State ex rel. O'Connell v. Crandall, 562 S.W.2d 746, 749-50[6] n. 5 (Mo.App.1978); Stanfill v. Stanfill, 505 S.W.2d 438, 439[2] (Mo. App.1974).[3] No agreement appears in the record here.
We acknowledge, of course, that documents prepared out of court may qualify for admission in evidence under The Uniform Business Records as Evidence Law, §§ 490.660-.690, RSMo 1986. However, no effort was made by the child's lawyer to lay a foundation qualifying Exhibit 2 for admissibility as a business record and the child does not contend on appeal that Exhibit 2 should have been received in evidence on that ground.
It is arguable, however, that by reason of the wording of paragraph 2 of the second request for admissions, defendant was deemed to have admitted not only that Exhibit 2 was what it purported to be, i.e., a document signed and sworn to by Lloyd C. Osborne, an official of Roche Biomedical Laboratories, but also was deemed to have admitted that the tests conducted at Roche *222 Biomedical Laboratorieswhatever they weredid in fact produce the results set forth on Exhibit 2. If the latter construction be correct, the child's second point cannot be answered merely by applying the general rule barring admission of affidavits in evidence.
We are persuaded, however, that even under the broader construction of paragraph 2 of the second request for admissions, the trial court did not err in excluding Exhibit 2.
B.S.H. v. J.J.H., 613 S.W.2d 453, 457[9] (Mo.App.1981), teaches that scientific evidence does not by the mere appellation of the term acquire absolute verity but, like other evidence, depends on qualitative factors which themselves tend to lend greater or lesser credence to the proof. In short, scientific evidence depends on the methodology employed to obtain it and the skills of those who possess or claim to possess some expertise in the subject, all of which must be shown as essential to the proof. Id. In B.S.H., reports of blood tests of a wife, a husband and two children were received in evidence, apparently by agreement. The appellate court nonetheless determined that inasmuch as any conclusion which might be extracted from the reports as to the issue of paternity depended significantly on speculation, conjecture and nonprofessional extrapolation, the reports did not rise to the level of scientific proof. Id. at 457[10]. No witness testified as to what methods were employed to identify the blood characteristics and what professional qualifications were held by the unidentified persons who performed the tests. Id. at 456.
In the instant case nothing in the child's second request for admissions called upon defendant to admit (1) the identity of the person or persons who performed the tests at Roche Biomedical Laboratories, (2) their education, training, experience and competency to perform such tests, (3) the tests that were performed on the various blood group systems to obtain the data set forth on Exhibit 2, or (4) the scientific acceptance and reliability of such tests. Absent such showing, defendant's objection that there was "no foundation" for receipt of the results in evidence was well taken.
The child argues, however, that inasmuch as defendant selected Roche Biomedical Laboratories to perform the tests, defendant should be barred from insisting that a proper foundation be laid for the admission of the test results in evidence. The child cites no authority for that thesis and we are aware of none. The child's second point is denied.
As the trial court did not err in any respect asserted by the child in this appeal we are obliged to affirm the judgment even though the child's evidence would have amply supported a verdict that defendant is the child's father. That issue, however, was for the jury to decide, and in deciding it the jury was at liberty to disbelieve the child's evidence if it so elected. Pratt v. Cudworth, 637 S.W.2d 720, 722-23[2] (Mo. App.1982); Gambrell v. Kansas City Chiefs Football Club, 621 S.W.2d 382, 384 (Mo.App.1981).
Judgment affirmed.
HOLSTEIN, C.J., and GREENE, J., concur.

ON MOTION FOR REHEARING OR, IN THE ALTERNATIVE, TO TRANSFER TO THE SUPREME COURT
PER CURIAM.
The child, in a strenuous motion for rehearing or, in the alternative, to transfer this cause to the Supreme Court of Missouri, maintains that inasmuch as defendant employed Roche Biomedical Laboratories as defendant's "expert" to conduct tests on blood from himself, the mother and the child, "the test results were admissible as an admission against interest of the [defendant] made by [defendant's] agent, specifically authorized and employed to make the test and report the results." The child insists that in upholding the trial court's ruling sustaining defendant's objection to Exhibit 2, our opinion is in conflict with Blevins v. Cushman Motors, 551 S.W. 2d 602 (Mo. banc 1977), and Kimberlin v. *223 C.M. Brown and Associates, Inc., 722 S.W. 2d 90 (Mo.App.1986).
There is no conflict.
In Blevins, a product liability case, the plaintiffs sued the manufacturer of a golf cart that overturned, injuring one of the plaintiffs. When the plaintiffs submitted interrogatories concerning the design, construction and performance of the cart, the answers to the interrogatories came back signed by the manufacturer's chief engineer. The plaintiffs subsequently took the chief engineer's deposition and, at trial, offered portions of the deposition as admissions against interest of the manufacturer. The trial court, over the manufacturer's objection that the deponent had not been shown to be authorized to make admissions on its behalf, admitted the excerpts in evidence. Upholding the ruling on appeal, the Supreme Court of Missouri held that the manufacturer's designation of its chief engineer for the purpose of answering interrogatories made the engineer's answers on deposition within the scope of his authority. Id. at 613-14[18].
Such circumstances do not exist in the instant case. Here, when the child served interrogatories on defendant, defendant answered them himself. Nowhere in the record is there any indication that defendant authorized Roche Biomedical Laboratories or any of its employees to act as defendant's agent in answering interrogatories or responding to requests for admissions. Additionally, nothing in the record suggests Roche Biomedical Laboratories was ever an agent, servant or employee of defendant. The record demonstrates at most that defendant selected Roche Biomedical Laboratories to perform blood tests on the one occasion alluded to earlier, that Roche performed tests on the blood of defendant, the mother and the child, that Roche supplied defendant Exhibit 2 setting forth the results, and (inferentially) either defendant or his attorney obligated himself to pay Roche for its services.
As explained in George v. Lemay Bank and Trust Co., 618 S.W.2d 671, 674[1, 2] (Mo.App.1980), the relationship of principal and agent arises out of contract, express or implied, whereby one person, the agent, consents with another, the principal, to act on behalf of the principal subject to the control of the principal. As distinguished from an agency relationship, an independent contractor exercises an independent employment and contracts to do a piece of work according to his own methods. The right of the person employed to control the method of doing the work is the principal consideration in determining the relationship.
In the instant case it is manifest that neither Roche Biomedical Laboratories nor any employee thereof was ever an agent of defendant. Defendant simply contracted with Roche for the latter to do a piece of work (perform the blood tests and furnish a report of the results) according to Roche's own methods, free from any control by defendant. This is amply demonstrated by the following questions and answers in defendant's deposition, read to the jury by the child's lawyer.
[Q.] "After you or your attorney received a copy of [the report of the results of the] blood test [performed by Baptist Memorial Hospital], I believe you selected or your attorney selected another organization to make a second blood test; isn't that true?"
[A.] "Yes."
[Q.] "Let me hand you what's been marked ... Exhibit 2, do you recognize that?"
[A.] "Yes."
[Q.] "This is a copy of the report that you received then; is it, Mr. [M.]?"
[A.] "Yes."
[Q.] "And according to this report the probability of paternity is 98.33 percent; is that correct?"
[A.] "I'm not in the biomedical laboratory business...."
We know of no case, and none is cited, holding that an institution which, at the instance of a party to a suit, performs scientific tests for the purpose of obtaining results that such party may choose to offer as evidence at trial, thereby becomes the agent of such party so that the institution's *224 report of the test results constitutes an admission against such party's interest.
We likewise find no conflict between our opinion in the instant case and Kimberlin, 722 S.W.2d 90, the other case cited by the child. In Kimberlin, a suit by a former employee against his former employer for unpaid commissions allegedly due the employee by the employer, the trial court received in evidence a group of computer printouts (Exhibit 3) consisting of summaries of invoices for business generated during the period in question. Such documentscharacterized as "producer statements"were prepared by a computer company employed by the employer and were given to the employees monthly as a record of business generated and commissions earned. The trial court also received in evidence summaries prepared from the "producer statements." The employer contended on appeal that all the exhibits were inadmissible hearsay. Rejecting the employer's contention, the appellate court held Exhibit 3 was clearly a business record under § 490.680, RSMo 1978. Id. at 91[4]. The opinion added:
"We find it incongruous for [the employer] to contend that materials prepared by its agent at its request from its records for use by its employees as a monthly record of their productivity and earnings lack sufficient credibility to be admitted into evidence. In addition, these are [the employer's] records and were admissible as admissions. The remaining exhibits are summaries of an admissible document and are admissible on that basis." Id. at 91[5].
It is obvious that Exhibit 2 in the instant case was not a business record of defendant, as he declared he was "not in the biomedical laboratory business." Moreover, as observed in our opinion, the child makes no contention that Exhibit 2 qualified for admissibility as a business record.
We consequently find no conflict between our opinion and either of the two cases cited by the child, and we reject the child's thesis that Exhibit 2 was admissible in evidence as an admission by defendant's agent against defendant's interest.
Another hypothesis advanced by the child is that our opinion "rejects the reliability and significance of the blood tests in paternity suits," and is thus in conflict with an earlier opinion of this Court, G____ M____ H____ v. J____ L____ H____, 700 S.W.2d 506 (Mo.App.1985). The child proclaims, "[The] opinion in [the instant] case causes the status and reliability of paternity blood testing to be a great confusion and uncertainty in Missouri."
While the fundamental difference between the instant case and the earlier case should be apparent to any discerning reader, we shall underscore it in the paragraphs that follow.
In the earlier case, an action for dissolution of marriage, a written report supplied by the institution that performed tests on blood drawn from the husband, the wife and the child was received in evidence by agreement of the parties, along with a tape recording of an interview of the pathologist (Dr. Grannemann) who sent the blood specimens to the testing institution. The interview of Dr. Grannemann, conducted by counsel for the parties, contained an explanation by Grannemann that the physician who had signed the report was an authority in the field of paternity testing and had authored a text widely available on the subject. Among the 13 gene systems tested, four revealed that the husband could not be the father of the child. Dr. Grannemann, in his interview, explained three of those four tests. The issue in that case was not whether the report of the test results qualified for admission in evidence as noted earlier the report was received in evidence by agreementbut was instead whether the trial court's adjudication that the husband was the child's father was unsupported by substantial evidence or was against the weight of the evidence. We emphasized in that case that as the report of the testing institution was received in evidence by agreement it could be considered along with other evidence in the case even though it was hearsay. 700 S.W. 2d at 512[1].
In the instant case the issue regarding the results of the testing by Roche Biomedical *225 Laboratories was whether they were presented by the child in the trial court in a manner that satisfied the rules of admissibility over defendant's objection that the child had failed to lay a sufficient foundation for admissibility. The issue was not whether such results, had they been presented so as to qualify for admissibility, would have constituted reliable and significant evidence on the issue of paternity. There is consequently no conflict whatever between our opinion in the instant case and our opinion in G____ M____ H____.
The child advances other contentions in the post-opinion motion but they were either adequately addressed in our opinion or require no discussion. The motion for rehearing or, in the alternative, to transfer to the Supreme Court of Missouri, is denied.
NOTES
[1] Trial occurred October 14, 1987.
[2] N.R. v. A.D., 691 S.W.2d 350, 352[5] (Mo.App. 1985), holds that the factors a court may consider regarding credibility of a mother who seeks to establish paternity include a history of sexual promiscuity.
[3] An exception appears in Liberty Financial Management Corp. v. Beneficial Data Processing Corp., 670 S.W.2d 40, 55-56 (Mo.App.1984), where the affiant, in a pretrial deposition, was asked if all the statements in his affidavit were true and was then cross-examined in detail regarding the statements in the affidavit. Framing the issue as whether a witness' written statement may be admitted where the witness testifies that the averments in the statement are true and subjects himself to cross-examination regarding the truth of such matters, the appellate court held in the affirmative. Such circumstances do not exist in the instant case.