Daphne YOKLEY, Appellant,

v.

Gary TOWNSEND, Respondent.

No. WD 46224.

Missouri Court of Appeals,
Western District.

March 23, 1993.

Lana R. Woolsey, Ass't Pros. Atty., Columbia, for appellant.

Jean E. Goldstein, Columbia, for respondent.

Before BRECKENRIDGE, P.J., and SHANGLER and SPINDEN, JJ.

SPINDEN, Judge.

Daphne Yokley, a Tennessee resident, appeals the trial court's denial of her request that it declare Gary Townsend, a Missouri resident, to be the father of her child and that it order him to pay child support. Yokley sued under the provisions of the Uniform Reciprocal Enforcement Support Act (URESA), §§ 454.010 to 454.-360, RSMo, asking for paternity and child support in accord with Missouri guidelines. She contends that the trial court erroneously excluded the results of tests of Townsend's blood. We affirm the judgment of the trial court.

The case was tried on March 5, 1992. Yokley testified that according to medical records she became pregnant on February 20, 1981, and the period of gestation was 288 days. Her son was born on December 4, 1981, and weighed 8 pounds and 5 ounces. She said her pregnancy was normal. She said that she and Townsend had sexual intercourse in Clarksville, Tennessee, at either her sister's apartment or Townsend's

apartment, every weekend for months until April 1981. She denied having sexual relations with any other man within 280 days before her son's birth.

At trial, Yokley sought to introduce results of a blood test which Townsend had voluntarily submitted to without court order. Townsend objected on the ground that Yokley had not established chain of custody and not laid a foundation for overcoming a hearsay objection. The trial court took the objection with the case and later sustained the objection.

Townsend testified that he had sex with Yokley prior to his entering the Air Force in January 1980. He acknowledged that he had an apartment in Clarksville until he entered the Air Force. From June 1980 to August 1984, he was stationed at Gunter Air Force Base in Montgomery, Alabama, and from late November 1980 through April 1981, he lived in Montgomery with his fiancee. In addition to his Air Force duties, Townsend said he worked evenings and weekends at a department store in Montgomery. Clarksville is about a five-and-one-half-hour drive from Montgomery.

After entering the Air Force, Townsend said he saw Yokley twice before her son was born. He saw her in the fall of 1980 at her residence in Columbia, Tennessee, but he did not have sex with her. He saw her on April 18, 1981, in Clarksville, and they attempted to have sex. Townsend visited Yokley once after her son was born, and he saw the child then.

Dr. Frank Clark, a neonatologist, testified that an infant conceived on April 18, 1981, has only a one percent chance of weighing 8 pounds and 5 ounces on December 4, 1981. Normal birth weight for that gestation is 4 pounds and 3 ounces.

After the trial, the court entered its order:

Upon the evidence adduced and through judicial notice of this file and the orders contained within, the court finds:

1.) This action was commenced under the Uniform Reciprocal Enforcement of Support Act sections 454.010–454.360 RSMo;

2.) This court has jurisdiction to determine paternity under URESA–sections [sic] 454.200, RSMo;

3.) There is no independent proceeding to determine paternity under the Uniform Parentage Act sections 210.817 to 210.852, RSMo;

4.) No court order for paternity blood testing has been entered requiring the parties to submit to blood tests;

5.) The court did enter an order on 5/11/89 requiring the state of Tennessee to pay for blood tests with consent of both parties;

6.) The parties voluntarily submitted to blood tests;

7.) The provisions of section 210.834.5, RSMo do not apply to the admissability of the results of the blood testing contained in [Yokley's] exhibit # 1;

8.) Motion to exclude blood tests should be sustained; the court now considering all evidence admitted in this case finds in favor of [Townsend] and against [Yokley].[1]

We will sustain the trial court's judgment unless we find no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Yokley contends the trial court erred in ruling that § 210.834.5, RSMo Supp.1992, did not apply to the admissibility of Townsend's blood test results. She asserts that the Uniform Parentage Act (UPA), §§ 210.817 to 210.-852, RSMo, applies to actions brought pursuant to URESA. We conclude that § 210.834.5 is not applicable to this case because Townsend's blood tests were not ordered by the court.[2]

Section 210.834 provides:

1. The court may, and upon request of any party shall, require the child, mother, alleged father, any presumed father who is a party to the action, and any male witness who testifies or will testify about his sexual relations with the mother at the possible time of conception, to submit to blood tests. The tests shall be performed by a court-designated expert qualified as an examiner of genetic markers present on blood cells and components, or other tissue or fluid.

2. The court, upon reasonable request by a party, may order that independent tests be performed by other experts qualified as examiners of genetic or other markers present on blood cells or other components, or other tissue or fluid. In all cases, the court shall determine the number and qualifications of the experts.

3. If any party refuses to submit to blood tests ordered by the court under subsection 1 or 2 of this section, such refusal shall constitute civil contempt of court, and such refusal shall be admissible as evidence in the action.

4. Whenever the court finds that the results of the blood tests show that a person presumed or alleged to be the father of the child is not the father of such child, this evidence shall be conclusive of nonpaternity and the court shall dismiss the action as to that party, and the cost of such blood tests shall be assessed against the state. The court shall order the state to pay reasonable attorneys fees for counsel and the costs of any blood tests where such blood tests show that the person presumed or alleged to be the father of the child is not the father of such child and the state proceeds further in an action under sections 210.817 to 210.852 to attempt to establish that such person is the father of the child.

5. Verified documentation of the chain of custody of the blood or tissue specimens is competent evidence to establish such chain of custody. A verified expert's report shall be admitted at trial as evidence of the blood test results stated therein unless a written motion challenging testing procedures or the results has been filed and served on each party at least twenty days before the trial, and the motion is sustained by the court.

---

**1.** The original was in capital letters.

**2.** Because we reach this conclusion, it is unnecessary for us to determine whether the UPA is applicable in URESA proceedings for adjudicating paternity.

"It is a fundamental rule of statutory construction that sections and acts in pari materia, and all parts thereof, should be construed together, and compared with each other. No one act, or portion of all acts, should be singled out for consideration apart from all the legislation on the subject." *Fleming v. Moore Brothers Realty Company,* 363 Mo. 305, 251 S.W.2d 8, 15 (1952). Although § 210.834.5 does not specifically refer to court-ordered blood testing, it should be read in harmony with the other subsections. Subsections 1, 2, 3, and 4 of § 210.834 relate to court-ordered tests, and nothing suggests that subsection 5 does not concern the same. Section 210.834 merely carves a narrow exception to the normal rules of evidence: cases where the blood test is ordered by the court and conducted by a court-designated expert.

In court-ordered testing, the court selects the expert and approves the testing methods; therefore, the test carries some inherent indicia of reliability. The need for cross-examination about findings and qualifications of the expert is arguably lessened by the court's selection of the expert. This added indicia of reliability permits the court to receive the expert's verified report without the otherwise prerequisite foundation questions, unless a party challenges the report on another basis. Voluntary testing by an expert chosen by someone other than the court does not carry the same inherent indicia of reliability.

■ We conclude, therefore, that the trial court properly determined that § 210.834.5 did not apply in this action. Because Yokley did not establish a chain of custody and did not lay a foundation for the blood results, the trial court properly found the results inadmissable. Blood test results must be supported by evidence establishing the chain of custody. *Crockett v. Schlingman,* 741 S.W.2d 717, 719 (Mo.App.1987).[3] A proper evidentiary foundation must be laid concerning the methods employed and the qualifications of those who did the testing and interpreted the results. *D.K.L. by K.L. v. H.P.M.,* 763 S.W.2d 212, 222 (Mo. App.1988).

**3.** Although we recognize that this case was commenced before the effective date of the UPA, the

For these reasons, we affirm the trial court's judgment.

All concur.

reasoning still is relevant for those instances in which § 210.834.5 is not applicable.